### GAINES *v.* DE LA CROIX.

1. As the law stood in Louisiana, in October, 1813, testamentary executors could only sell at public auction after due advertisement of the property; and the purchaser at a forced sale did not acquire a good title, unless the formalities prescribed by law for the alienation of property were observed.

2. A purchaser of property from an executor of a will of one date, who has at the time strong reasons to believe, and had recently declared solemnly that he did believe that a later will with different executors and different dispositions of property had been made, is not protected from liability to the parties interested under such later will, if established and received to probate, by the fact that the executor of the first will made the sale under order of court having jurisdiction of such things. He purchases at the risk of the later will's being found, or proved and established.

3. If the later will is found, it relates back as against such a purchaser, and affects him with notice of its existence and contents as of the time when he purchased.

4. Facts stated which affect such a purchaser with notice.

As we have mentioned in the preceding case, Daniel Clark died on the 16th day of August, 1813, and his last will not being found, letters testamentary on the will of 1811 were granted to Richard Relf, who remained sole executor until 21st of January, 1814, when Beverly Chew was included in the trust. De la Croix made two purchases of slaves of Relf while thus acting as sole executor. The first purchase was on the 16th of October, 1813, and the last on the 11th of December, 1813.

The will of 1813 being established and received to probate, Mrs. Gaines filed her bill against De la Croix. De la Croix, it will be understood, was the same person so frequently mentioned in the preceding case as Dusnau De la Croix, or the Chevalier De la Croix, one of the persons whom Clark appointed executor of his will of 1813, and tutor to his daughter Myra.

The same counsel who argued the preceding case argued this.

Mr. Justice DAVIS delivered the opinion of the court.

There are points of difference between this case and that of *Gaines* v. *New Orleans*, decided at this term ; but, in our opinion, they are not such as to defeat the recovery asked for by the complainant.

It is contended by De la Croix that his titles derived from the purchases from Relf are valid, because he purchased within the year, while the functions of the executors were in full force. This is true if he purchased in good faith, and the requisites of the law on the subject of the sales of succession property were complied with. The examination of these points, in connection with the decision in the New Orleans case, will dispose of this case.

The last sale conveyed no title, because it was a private one, and was forbidden by the law. Executors could only sell at public auction after due advertisement of the property, and the purchaser at a forced sale did not acquire a good title, unless the formalities prescribed by law for the alienation of property were observed.* The bill of sale of October 16th, 1813, recites that the property was sold at public auction in conformity to the order of the register of the Court of Probate. This order is not produced, and it seems the recital of it in the act of sale does not prove it.†

But Relf, as executor, did petition the Court of Probate, on the day that letters testamentary were issued to him, for leave to sell the movables and immovable property of the succession, and the order was granted for the sale to take place according to law. It may be the effect of a sale under these circumstances would be to confer a good title, if the purchaser bought in good faith ; but De la Croix got the property in bad faith, and the

---

* Donelson *v.* Hull, 7 Martin, 113; 4 Id. 573.

† Lanfear *v.* Harper, 13 Louisiana Annual, 548.

vice of his title cannot be cured even if the sale were in all respects regular; nor can the plea of prescription help it.   These sales were made shortly after the death of Clark, when everything connected with his last will was fresh in De la Croix's mind; and he knew the will, under the probate of which he was buying, was not the true will of Daniel Clark.   The law imposed on him altogether a different line of conduct from what it would have imposed if he had been ignorant of the existence and contents of the will of 1813.   It was his duty as one of the executors under that will, and the tutor of the testator's child —both of which trusts he accepted—to test the question in the courts of Louisiana whether that will could not be proved and established, although it could not be found.   If an earnest effort to do so had been made, can we say that the courts of that day would not have reached the same conclusion that the Supreme Court of the State did twelve years ago?   Every day's delay increased the difficulty of proving its validity, and yet so full was the proof that the court, as late as 1856, did not hesitate to recognize it.   De la Croix doubtless acted on the assumption, that as the will of 1813 could not be found, he had a right to buy under the will which was proved.   But he risked everything by so doing; for if it should afterwards be found, or if not found, established by oral proof, as he bought knowing all about it, he would be considered a buyer in bad faith, and his title would fail.   As the will of 1813 is in fact *now* probated, it relates back and affects him as of the time when he purchased with notice of its existence and contents.

It is said he did not know enough about this will to be chargeable with notice.   We are sorry to have it to say that there is full proof to the contrary.   He knew the will produced was not the will which Clark had shown to him, because the superscription was different, and he was not named in it as one of the executors, and besides Clark had told him of a former will in which Relf & Chew were named as executors.   So sure was he that Clark's last will had in some mysterious way disappeared, that only two days after Clark died he requested the Court of Probate to summon the different notaries of New Orleans, to see if a will posterior to the one produced had not been left with one of them, as he had strong reasons to believe such a will was executed, in which he was interested.   If he had acted further

on his convictions produced by "these strong reasons," his memory would have been saved from the obloquy which attaches to it, and his estate from considerable loss.

It is very clear that De la Croix knew of the existence of the will of 1813, and it is equally clear he knew enough of its contents to be affected with notice. The testimony of Boisfontaine removes from the mind all doubt on the subject. He swears to being present at Clark's house a short time before his death, when Clark took a sealed packet, and handed it to De la Croix, and said, "My last will is finished; it is in this sealed packet with valuable papers. As you consented, I have made you in it tutor to my daughter. If any misfortune happen to me, will you do for her all you promised me? Will you take her at once from Davis? I have given her all my estate in my will, an annuity to my mother, and some legacies to friends." This information gave all the notice required, as it substantially communicated the contents of the will.

It is true De la Croix denied in 1834 that he knew the contents of this will, but this was after controversy had arisen, and when he was interested to sustain the will of 1811. It is a little singular that Clark communicated less freely with De la Croix than with Bellechasse and Pitot; for besides the trust to execute the will committed to them jointly, he reposed especial confidence in De la Croix by intrusting his child to his care; and yet Bellechasse swears Clark read the will to him and Pitot. Bellechasse and Pitot, as Bellechasse says, believed the real will was suppressed, and the provisional will of 1811 fraudulently substituted in its place. De la Croix must have believed the same thing when he asked for process against the notaries; and he admits that he consented to serve as executor. Now is it to be believed that these gentlemen, with the responsibilities cast upon them, which they had voluntarily assumed, and under the circumstances attending the execution and disappearance of the will of a man of the wealth and position of Daniel Clark, should never have met and consulted about it, and talked over the provisions in it? It would require a credulity not often met with to believe that no such meeting and consultation took place.

That the executors of the last will of Daniel Clark and the guardian of his child did not discharge their duties under the will, and had no realizing sense of their nature and extent, can-

not be doubted. Whether the failure to act proceeded from indifference, weakness, or something more censurable, we have no means of determining. Be this as it may, in not doing what duty to their deceased friend and their own honor required them to do, they have entailed hardship and pecuniary loss on others.

Enough has been said in this case to show that De la Croix knew of the making of this will, and also knew substantially what were its contents. If so, in law as well as in morals, he purchased the property in dispute in bad faith, and must account for it to the real owner.

The decree of the Circuit Court for the Eastern District of Louisiana REVERSED, and this cause remanded to that court with instructions to enter a decree for the complainant in conformity with this opinion and the opinion in the case of *Gaines* v. *New Orleans,* and to refer the case to a master to take proof, and ascertain the amount due.

GRIER, SWAYNE, and MILLER, JJ., dissented.